SLIP OP. 02-10

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| ACCIAI SPECIALI TERNI S.p.A. and ACCIAI SPECIALI TERNI USA, | : : : | |
| Plaintiffs, | : : | |
| v. | : : : | Before: WALLACH, Judge Court No.: 99-06-00364 |
| UNITED STATES, | : : | |
| Defendant, | : : | **PUBLIC VERSION** |
| and | : : | |
| ALLEGHENY LUDLUM CORP., et al., | : : | |
| Defendant-Intervenors. | : : | |

[Remand Determination remanded for further investigation.]

Decided: February 1, 2002

Hogan & Hartson L.L.P. (Lewis E. Liebowitz, Richard L.A. Weiner, Lynn G. Kamarck, Craig A. Lewis, Deen Kaplan), for Plaintiffs.

Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; U.S. Department of Justice, Civil Division, Commercial Litigation Branch (Brent M. McBurney, Lucius B. Lau); Robert E. Nielson, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant.

Collier Shannon Scott, PLLC (David A. Hartquist, Paul C. Rosenthal, Lynn Duffy Maloney, Eric R. McClafferty, Kathleen W. Cannon and R. Alan Luberda), for Defendant-Intervenors.

## **OPINION**

**WALLACH, Judge.**

### I
### **Preliminary Statement**

Plaintiffs dispute the United States Department of Commerce International Trade

1

Administration's ("Commerce" or "the Department") finding in the Final Results of Redetermination Pursuant to Court Remand, Acciai Speciali Terni S.p.A. v. United States (Dep't Commerce 2001) ("Remand Determination") that the 1994 sale of Acciai Speciali Terni S.p.A. ("AST") to private parties did not extinguish governmental subsidies received prior to the sale and that the privatized company continued to benefit from these subsidies. Plaintiffs' challenge follows the voluntary remand of Commerce's decision in Final Affirmative Countervailing Duty Determination; Stainless Steel Plate in Coils from Italy, 64 Fed. Reg. 15508 (1999) ("Final Determination").

The court finds that Commerce, by failing to completely eliminate its earlier per se treatment of subsidy benefits following a change in ownership through its "same person" test, has not made its Remand Determination in accordance with the law.

## II
## STANDARD OF REVIEW

In reviewing Commerce's determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994). The specific determination the court must make is "whether the evidence and reasonable inferences from the record support the finding." Dae Woo Elecs. V. United States, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (quoting Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984)). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Matsushita, 750 F.2d at 932 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 83 L. Ed. 126, 59 S. Ct. 206 (1938)).

# BACKGROUND

On March 31, 1998, domestic steel producers Allegheny Ludlum Corp., et al., filed a countervailing duty petition with Commerce that alleged that AST, a privatized corporation born out of the Government of Italy's ("GOI") restructuring of government-held steel corporations, continued to benefit from various subsidies bestowed upon its government-owned predecessors prior to its inception. See Initiation of Countervailing Duty Investigations: Stainless Steel Plate in Coils From Belgium, Italy, the Republic of Korea and the Republic of South Africa, 63 Fed. Reg. 23272 (Dep't Commerce 1998) ("Initiation Notice"). On September 4, 1998, Commerce published its Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination: Stainless Steel in Plate Coils From Italy, 63 Fed. Reg. 47246 (Dep't Commerce 1998). On March 31, 1999, Commerce published its Final Determination, 64 Fed. Reg. 15508 (Dep't Commerce 1998). Following an affirmative injury determination by the United States International Trade Commission ("ITC"), see 64 Fed. Reg. 25515 (ITC 1999), Commerce issued a CVD order directed at stainless steel plate imported from Italy. See 64 Fed. Reg. 25288 (Dep't Commerce 1999).

That affirmative injury determination was based on Commerce's original countervailing duty ("CVD") methodology, which assumed that any subsidy and benefit conferred on an entity "passed through" regardless of any sale or change in ownership of that entity. It had been Commerce's practice to terminate its inquiry as to whether a "benefit" exists at the time the subsidy was bestowed, thereby ignoring all subsequent events as irrelevant. Moreover, a change of ownership was deemed one such subsequent event and considered irrelevant in determining the existence of a "benefit", while the fact a purchaser may have bought the assets at fair market

value was also deemed irrelevant.

Following the passage of the Uruguay Rounds Agreements Act, § 102(c)(1), 108 Stat. 4818, 19 U.S.C. §§ 3512(b)(2)(A), 3512(c)(1), however, the Tariff Act of 1930 ("the Act") was amended to reflect the changes stemming from that accord. Accordingly, the Act currently provides that before Commerce imposes a countervailing duty on merchandise imported into the United States, it must determine that a government is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of that merchandise. See 19 U.S.C. § 1671(a)(1) (1994).

On February 2, 2000, the Federal Circuit ruled in Delverde, SRL v. United States, that Commerce could no longer rely upon its earlier per se rule under the amended Tariff Act. See Delverde, SRL v. United States, 202 F.3d 1360, 1364 (Fed. Cir. 2000) ("Delverde III"). The court concluded "the Tariff Act as amended does not allow Commerce to presume conclusively that the subsidies granted to the former owner of Delverde's corporate assets automatically 'passed through' to Delverde following the sale. Rather, the Tariff Act requires that Commerce make such a determination by examining the particular facts and circumstances of the sale and determining whether Delverde directly or indirectly received both a financial contribution and benefit from the government." Id. at 1364. At issue was the Act's subsidy definition, 19 U.S.C. §1677(5)(B). Paragraph (5)(B) provides the following "description" of a subsidy:

(B) Subsidy described

A subsidy is described in this paragraph in the case in which an authority--

    (i) provides a financial contribution,

    (ii) provides any form of income or price support within the meaning of Article XVI of the GATT 1994, or

    (iii) makes a payment to a funding mechanism to provide a financial contribution, or entrusts or directs a private entity to make a financial

4

contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments

to a person and a benefit is thereby conferred. For purposes of this paragraph. . ., the term "authority" means a government of a country or any public entity within the territory of the country.

19 U.S.C. § 1677(5)(B).

On August 14, 2000, Commerce was ordered by this court, pursuant to a motion for voluntary remand, to issue a determination in this matter, in accordance with U.S. law and specifically the Federal Circuit's decision in Delverde III.[1]  Following this decision, Commerce submitted questionnaires to AST and petitioners regarding the employed privatization methodology given the holding of Delverde III.  On December 19, 2000, Commerce issued its Remand Determination.

In its Remand Determination, Commerce ostensibly renounced its earlier per se rule, and formulated a new test, the "same person" test, as a threshold inquiry prior to reaching the contribution and benefit analysis espoused by the Federal Circuit.  Commerce has taken the position that "[i]n order to determine how the Delverde III court's holding applies to the facts before [Commerce], the first requirement is to determine whether the person to which the subsidies were given is, in fact, distinct from the person that produced the subject merchandise exported to the United States." Remand Determination at 6.

Using this analysis, Commerce maintains that where the pre-sale entity and the post-sale entity are effectively the "same person," as opposed to "distinct persons," further steps are

---

[1] In relevant part, the August 14, 2000 order provided "that the investigation at issue in this action, Final Affirmative Countervailing Duty Determination:  Stainless Steel Plate in Coils from Italy, 64 Fed. Reg. 15508 (Mar. 31, 1999), is hereby remanded to the U.S. Department of Commerce for 120 days from the date of this order to issue a determination consistent with United States law, interpreted pursuant to all relevant authority, including the decision of the Court of Appeals for the Federal Circuit in Delverde, SRL v. United States, 202 F.2d 1360 (Fed. Cir. 2000) . . . ."

unnecessary. Hence, where the post-sale entity is the "same person" as the pre-sale entity, the contribution and benefit enjoyed by the former, by definition, flows to the latter. "Where it is demonstrated that those two entities are the same 'person,' we will determine that all of the elements of a subsidy are established, i.e., we will determine that a 'financial contribution' and a 'benefit' have been received by the 'person' that is the firm under investigation." Id. at 7. Under this approach, "if the firm under investigation is the same person as the one that received the subsidies, nothing material has changed since the original bestowal of the subsidy, so that the statutory requirements for finding a subsidy are satisfied with regard to that person." Id.

On the basis of this test, Commerce determined that its original conclusion that KAI-owned AST reaped benefits of subsidies conferred upon GOI-owned AST was still valid. This new test, Commerce's determination based thereon, and Commerce's attendant determinations and calculations are the primary focus of this litigation.

**B**

**History of Restructuring and Asset Liquidation that Gave Rise to AST**

Prior to 1987, Terni, S.p.A, ("Terni"), was the sole producer of stainless steel plate in coils in Italy.[2] Finsider was a holding company that controlled all state-owned steel companies in Italy, in addition to Terni. The Italian Government, in turn, owned Finsider, through its own holding company, Istituto per la Ricostruzione Industriale ("IRI"). Under a restructuring initiative in 1987, Terni transferred its assets to a new company, Terni Acciai Speciali ("TAS").

In 1988, another restructuring program was undertaken, liquidating Finsider and its main operating companies (TAS, Italsider, and Nuova Deltasider), and establishing a new company,

---

[2] Unless otherwise specified, the discussion of the restructuring and liquidations that gave rise to AST is based on the Final Determination, 64 Fed. Reg. at 15508-09.

government-owned ILVA S.p.A. ILVA S.p.A. succeeded and took over a mixture of assets and liabilities originally belonging to the liquidated companies. With respect to TAS, part of its liabilities and the majority of its viable assets, including all the assets associated with the production of plate, transferred to ILVA S.p.A. on January 1, 1989. ILVA S.p.A. became operational on the same day. On April 1, 1990, a further part of TAS's remaining assets and liabilities was transferred to ILVA S.p.A. After April 1, 1990, only certain non-operating assets remained in TAS; it no longer possessed any operating assets.

During 1989 to 1993, ILVA S.p.A. was comprised of several operating divisions. The Specialty Steels Division, located in Terni, produced the subject merchandise. ILVA S.p.A. was also the majority owner of a large number of separately incorporated subsidiaries, some of which produced various types of steel products. ILVA S.p.A.'s other subsidiaries included service centers, trading companies, and an electric power company, among others. ILVA S.p.A. together with its subsidiaries constituted the ILVA Group ("ILVA"), which in turn was wholly-owned by the Italian government holding company, IRI. All subsidies received prior to 1994 were received by ILVA or its predecessors.

ILVA eventually became ILVA Residua following a liquidation in 1993. Very soon thereafter, two of ILVA's divisions were demerged in order to separately incorporate them. However, the Italian government continued to own these separately incorporated divisions, AST and ILVA Laminati Piani ("ILP"). The ILVA specialty steels operations responsible for the production of stainless steel plate in coils was transferred to AST, while ILVA's carbon steel flat products operations were transferred to ILP. The remaining ILVA's assets and liabilities, stayed with ILVA Residua.

In December 1994, through a share transfer scheme, AST was sold to a private German-Italian holding company, KAI Italia S.r.L. ("KAI"). Between 1995 and the Period of Investigation (1995 to 1997), a number of further restructurings and changes in ownership of

AST and its parent companies occurred.   Ultimately, the German company, Krupp Thyssen Stainless GmbH owned 75 percent of AST, and the remaining 25 percent was owned by the Italian company, Fintad Securities S.A.

## 2
## Subsidization

The current subsidies occurred primarily during the 1988-90 restructuring of Finsider and the 1993-94 restructuring of ILVA.  These restructuring programs were built upon debt forgiveness packages from the GOI, in addition to equity infusions made periodically during this time frame, and exchange rate guarantees pursuant to Law 796/76.  The EC maintained two of its own subsidy programs on AST's behalf, which included  grants pursuant to the European Social Fund program and preferential loans pursuant to the ECSC Article 54 Loan program.

## IV
## ARGUMENTS

## A
## Plaintiffs

Plaintiffs maintain that Commerce completely sidestepped its obligations under the court's August 14th Order and the Federal Circuit's holding in <u>Delverde III</u>.  In particular, Plaintiffs fault Commerce for devising a methodology that they claim has no basis in either the controlling statute or <u>Delverde III</u>.  Moreover, they claim that such methodology runs counter to not only the <u>Delverde III</u> holding but also the World Trade Organization ("WTO") Panel and Appellate Body's interpretation of the WTO Agreement on Subsidies and Countervailing

Measures ("SCM") Agreement in UK Leaded Bars,[3] which they further claim is a violation of the "United States' international obligations, and hence the U.S. statutory obligations under the *Charming Betsy* doctrine." Plaintiffs' Supplemental Brief Commenting on the Agency's Remand Determination ("AST's Supplemental Brief") at 30.

In addition, Plaintiffs claim that by the terms of Commerce's own test, Commerce erroneously concluded that KAI-owned AST benefitted from any subsidies bestowed upon GOI-owned AST. Plaintiffs base this assessment primarily on their assertion that "the fundamental flaw in the Department's superficial analysis is that it is premised on the notion that the proper basis of comparison for purposes of its 'distinct' person determination is between the GOI-owned AST (post-demerger but before privatization) and KAI-owned AST (post-privatization)." AST's Supplemental Brief at 23 (footnotes omitted). Plaintiffs also attack Commerce's findings on each one of the four prongs of Commerce's "same person" test, stating that "even assuming that the Department's 'same person' analysis had any validity to the analysis mandated by the *Delverde* Court, the Department's conclusions with respect to the application of this test to this case are clearly not supported by substantial evidence on the record." Id. at 27-28.

Finally, Plaintiffs claim that Commerce improperly raised AST's margins, allegedly resulting in an unduly high subsidy margin of 17.25 percent versus 15.16 percent. Plaintiffs point to Commerce's attribution of 100 percent of the subsidies in issue to privatized AST, without examining whether any portion of the purchase price was used to extinguish past subsidies. In particular, Plaintiffs fault Commerce for failing to "attribute any of the subsidies

---

[3] The WTO Panel Body addressed the SCM agreement in United States - Imposition of Countervailing Duties on Certain Hot-Rolled Lead and Bismuth Carbon Steel Products Originating in the United Kingdom, WT/DS138/R, Report of the Panel (December 23, 1999). That decision was affirmed by the WTO Appellate Body in United States - Imposition of Countervailing Duties on Certain Hot-Rolled Lead and Bismuth Carbon Steel Products Originating in the United Kingdom, WT/DS138/AB/R, Report of the Appellate Body (May 10, 2000) ("UK Leaded Bars").

provided to state-owned ILVA to companies that ILVA separately sold prior to AST's privatization," as well as failing to "attribute any subsidies to post-privatization arm's length ownership changes." AST's Supplemental Brief at 30 (citing Remand Determination at 24). Plaintiffs further claim that Commerce unfairly resorted to "facts otherwise available" in determining the applicable subsidy rates as "the prerequisite for the application of adverse facts available has not been met." Id. at 31.

On this basis, Plaintiffs urge the court to find Commerce's "same person" test contrary to law. Secondly, Plaintiffs urge the court to compel Commerce to engage in a full benefit and contribution investigation prior to the imposition of any countervailing duties.

**B**

**Defendant**

Commerce avers throughout its papers that its "same person" methodology is in complete compliance with the Federal Circuit's holding in Delverde III and that, in fact, such a methodology is encouraged by that holding. As discussed, based on its reading of 19 U.S.C. § 1677(B)(5) and Delverde III, Commerce concludes that prior to engaging in a full contribution and benefit investigation, it must first determine whether the post-sale entity is the "same person" as the pre-sale entity. Moreover, according to Commerce, this reading is in full compliance with the United States' obligations under international law and UK Leaded Bars.

In short, Commerce stands by its "same person" test, claiming that the test is statutorily warranted and is sufficiently flexible and multifaceted to accurately determine whether the entities at issue are indeed the "same person." "[A]s a matter of law, Commerce's new privatization approach is consistent with the post-URAA CVD statute, as interpreted by the

10

Federal Circuit in <u>Delverde III</u>, and that a series of arguments from AST to the contrary have no merit." Defendant's Memorandum In Opposition to the Rule 56.2 Motion for Judgment Upon the Agency Record Filed by Acciai Speciali Terni, S.p.A and Acciai Speciali Terni (USA) ("Defendant's Opposition") at 10 (citations omitted). With regard to the four prongs comprising the test, Commerce states:

> They do not, by themselves, dictate any particular outcome and certainly do not give rise to any kind of presumption. The criteria were carefully selected to enable Commerce to make as meaningful a comparison as possible between the nature of the government-owned company, upon which the subsidies were originally bestowed, and the privatized company, the current producer of the subject merchandise. Such an inquiry does not lend itself to a bright-line test because of the multi-faceted makeup of a legal person. Accordingly, Commerce selected those factors which it believed would provide it with a meaningful basis for distinguishing or not between the two entities in the CVD context.

<u>Id.</u> at 36-37 (citations omitted).

Commerce also maintains throughout its pleadings and papers that the Plaintiffs misconstrue and oversimplify the scope and character of the "same person" test. Secondly, Commerce maintains that the statute itself mandates the "same person" determination and that Commerce merely supplied the framework for that determination. On this basis, Commerce concludes that "[i]n light of Commerce's finding that AST is the same person both before and after its privatization, all of the requirements for countervailing the pre-privatization subsidies continue to be met." <u>Id.</u> at 11.

## V

## ANALYSIS

## A

## A Subsidy Contribution Likely Travels From the Government-Owned Entity to the Privatized Entity Where They Are the "Same Person" but that Finding Alone Does Not Support the Conclusion that the Associated Benefit Travels Between These Entities As Well

The Federal Circuit in <u>Delverde III</u> did not provide specific guidance regarding a CVD methodology under these circumstances, so Commerce set out to develop appropriate criteria on its own. Commerce noted at the outset, moreover, that it was facing a complex task. Commerce explained that:

> in its experience, particularly when dealing with privatizations, it often does not encounter straightforward changes in ownership where the status of the firm under investigation is readily apparent. For example, it is not common for the Department to be confronted with a change in ownership accomplished through a simple sale of shares, which is the type of case that would most readily reveal no change in the legal person. Similarly infrequent are cases where the firm under investigation has simply purchased some but not all of another firm's subsidized assets outright, which, conversely, would normally mean that the firm under investigation was a different legal person from the original subsidy recipient. Rather, in the cases that the Department more usually sees, the transactions are complex and do not lend themselves to such straightforward analysis.

<u>Remand Determination</u> at 10.

Ultimately, Commerce formulated a test comprised of four non-dispositive prongs. Those factors are:

> [W]here appropriate and applicable, we would analyze factors such as (1) continuity of general business operations, including whether the successor holds itself out as the continuation of the previous enterprise, as may be indicated, for example, by use of the same name, (2) continuity of production facilities, (3)

12

continuity of assets and liabilities, and (4) retention of personnel. No single factor will necessarily provide a dispositive indication of any change in the entity under analysis. Instead, the Department will generally consider the post-sale entity to be the same person as the pre-sale entity if, based on the totality of the factors considered, we determine that the entity sold in the change-in-ownership transaction can be considered a continuous business entity because it was operated in substantially the same manner before and after the change in ownership.

Id. at 13. These factors reflect the common sense principle that where a company is privatized in a manner specifically designed to preserve the company's original structure, the privatized company in some respects can be deemed to be in the position of its predecessor.

**a**

**Commerce Selected the Proper Entities, Government-Owned AST and KAI-Owned AST, for Comparison**

Plaintiffs claim that Commerce focused on the wrong business units for comparison in deriving its "distinct person." In particular, Plaintiffs argue that Commerce should have engaged in a comparison between GOI-owned ILVA and KAI-owned AST, as opposed to GOI-owned AST and KAI-owned AST. This conclusion is based on Plaintiffs' characterization of the 1993 demerger of AST from GOI-owned ILVA to form GOI-owned AST as "simply a spin-off of a division of ILVA into a wholly-owned subsidiary of the same state-owned corporation." AST's Supplemental Brief at 23 (emphasis added). In other words, according to Plaintiffs, GOI-AST was in essence the same person as ILVA and therefore ILVA as a whole should be the subject for comparison. Moreover, Plaintiffs cite to Commerce's own discussion of the significance of the demerger as support for Plaintiffs' comparison:

[a]lthough the GOI on several occasions reconfigured the overall corporate environment within which AST's predecessors operated, there was no sale or ultimate change in ownership that would necessitate a reconsideration of who the subsidy recipient was prior to the 1994 privatization of AST. Rather, the specialty

13

steel business itself, as well as the ultimate ownership of this business, remained essentially unchanged from the early 1980's through December 1994.

Id. at 24 (quoting Remand Determination at 33).

However, AST's creation must be viewed within the overall context of the Italian steel industry's restructuring process, as it remained, prior and subsequent to privatization, a specialty steel operation in essentially the same form. For example, although the specialty steel operations were dubbed variously as Terni, Terni Acciai Speciali ("TAS"), and its current name AST, the character and scope of its business did not change. Indeed, Commerce states that "[a]lthough the GOI on several occasions reconfigured the corporate environment, there was no sale or ultimate change in ownership that would necessitate a reconsideration of who the subsidy recipient was prior to the 1994 privatization of AST," Defendant's Response at 41, clarifying that such event is insignificant as far as the flow of subsidies received prior to 1994. Per Commerce's past practice regarding internal restructurings of this nature, "all of the subsidies that had been bestowed on the government-owned specialty steel operations over the years continued to benefit those operations after the 1993 demerger, when government-owned AST became separately incorporated." Id.[4]

---

[4] Commerce cites to its articulation of this approach in the 1993 steel cases, where it explained:

> One type of restructuring activity is the corporate reorganization in which, most typically, assets are shifted amongst and between various related corporate entities. New corporate structures and relationships are established through the liquidation of corporate entities, the creation of new corporate entities, and the "sale" or transfer of assets between such related entities. No truly "outside" parties enter the corporate organization; rather, a new "web" of corporate relationships is created between old and new corporate entities. However, regardless of what changes occur in the corporate structure, the ultimate shareholder remains unchanged.

General Issues Appendix, 58 Fed. Reg. at 37266. In accordance with this phenomenon, Commerce stressed that "internal corporate restructurings that transfer or shuffle assets among

14

Commerce was, in fact, indicating that throughout the time leading up to the 1994 privatization, the specialty steel operations remained the same person despite its position in the Finsider or ILVA corporate structure. As such, Commerce did not characterize the 1993 demerger as an event conferring distinct personhood on GOI-AST. See Remand Determination at 35. AST's argument that Commerce's characterization of the 1993 demerger legitimizes a comparison between ILVA and KAI-AST as the basis of the "same person" inquiry misconstrues the import of this characterization. Rather, Commerce in asserting that the 1993 demerger was a "non-event" was merely emphasizing the fact that the proper unit of comparison is the specialty steel division of ILVA, independent of whatever nominal transition it may have undergone in the corporate hierarchy. This is consistent with Commerce's past practice in applying the CVD statute, when it has routinely linked the benefit accompanying a subsidy to a specific operating division, as opposed to the entire corporation.

Commerce's approach is driven by the notion that it would be inaccurate to treat anything other than the specialty steel operations, in whatever corporate form they took prior to the 1994 privatization, as the proper comparison point. On the other hand, AST's logic would enable a corporate parent to "spin-off" the operation that benefitted from the given subsidy, without exposing the spun-off operation to a CVD inquiry. Under its approach, any inquiry would target the corporate shell, which, as here, would no longer produce the specialty product and most likely would not have reaped the benefit of the subsidy. Commerce's approach, which emphasizes substance over form, is amply warranted under the circumstances.

---

related parties to constitute a 'sale' . . . . Legitimate 'sales' . . . must involve unrelated parties, one of which must be privately owned." Id. See Remand Determination at 17.

15

**b**

**Commerce Correctly Applied the "Same Person" Test to Demonstrate that Government Owned AST and the KAI-Owned AST were Indeed the Same Person**

Commerce properly applied and weighed the four prongs of its "same person" test, (1) continuity of general business operations, (2) continuity of production facilities, (3) continuity of assets and liabilities, and (4) retention of personnel, to determine that many material aspects of AST's operations remained unchanged following AST's privatization. Beginning with a brief synopsis of AST's restructuring history, Commerce asserts that "the business operations that eventually comprised AST basically existed intact as a discrete business entity since at least the 1980s (the period when the company was known as Terni or Terni Acciai Speciali, rather than the current name Acciai Speciali Terni.)" Remand Determination at 16. Based on its "same person" test, Commerce demonstrates that indeed AST's supply and customer structure, as well as its rights and obligations, remained intact following privatization.

**i.**

**Continuity of Business Operations**

As a general matter, AST was sold as a functional unit, complete with a preexisting customer base, supplier base, and market penetration. As AST itself states "[t]he company was attractive because of its portfolio of productive assets, manufacturing expertise and products. In addition, the company had access to desirable markets and customers for its production." Remand Determination at 20 (quoting AST Remand Questionnaire Response at 39). Hence AST was not purchased as a mere collection of assets but as a complete package that was, by design, meant to remain intact during and following the change in ownership. See Remand

16

Determination at 19 (quoting AST Remand Questionnaire Response at 6 ("[b]y selling AST as an operating entity, rather than merely auctioning its individual assets, IRI expected to obtain a higher sale price and thereby to maximize the revenue from the sale to IRI.")).

As Commerce found, AST was maintained as a continuous uninterrupted enterprise that was intended to benefit from its existing infrastructure and market exposure. See Remand Determination at 19. This is notably evidenced by the fact that AST continued to operate under the AST name even following acquisition by KAI. In addition, with regard to AST's supply network, Plaintiffs state "[t]he Terni and Torino plants formerly owned by ILVA have largely continued to use a similar supplier base. This is unremarkable, as the plants produced specialty steels before and after their fair market value privatization." AST Remand Questionnaire Response at 34. Similarly, AST's customer network remained relatively intact as part of the general effort to maintain AST's operations. See Remand Determination at 20.

### ii.
### Continuity of Production Facilities

The strategic value of AST's production facilities was not lost on its purchasers as part of its overall value and therefore these facilities remained functionally intact. The core of AST's operations as a specialty steel producer are the actual production facilities. Indeed, within the Propriety Planning Document (which was submitted as an attachment to AST's Remand Questionnaire Response) delineating AST's privatization, KAI states that AST:

[Has certain material cost advantages due to the location of its production facilities.]

Remand Determination at 21 (quoting AST's Proprietary Planning Document at 4). These facilities remain in Terni, Torino.

17

### iii.

### Continuity of Assets and Liabilities

Notably, AST's complete balance sheet of assets and liabilities were assumed in toto by KAI following the change in ownership. As per the GOI, "KAI assumed the whole of AST's indebtedness at the time the sale took place." GOI First Remand Supplemental Response at 3. Moreover, AST does not deny Commerce's assertion that all assets and liabilities were transferred intact. Rather, AST concludes that "[t]his finding is simply the inevitable result of the Department's improper focus on a division of ILVA (the 'demerged' AST) as opposed to ILVA as a whole." AST's Supplemental Brief at 26-27.

A business entity's liabilities are as telling of its overall structure as its physical assets and operations. Corporations are defined to a great extent by their debt as evidenced by the impact of debt in public corporate securitization. Therefore, the fact that AST's debt remained intact lends significant support to the assertion that, overall, AST remained relatively unchanged.

### iv.

### Retention of Personnel

It appears from the record evidence that AST's labor force was unscathed by the change in ownership. This is underscored by section 6.1 of the contract of sale governing AST's transfer to KAI. It provides that KAI would:

> [Guarantee to protect or approximate the status quo with regard to certain normative elements of AST's workforce composition and employment conditions, and abide by certain employment agreements already in existence.]

18

<u>Remand Determination</u> at 22 (quoting <u>Original Questionnaire Response</u>, Attachment A8-8 at 5). KAI was thus tasked by the GOI with maintaining the status quo of AST's labor force including the maintenance of and compliance of certain labor funds and privileges that were established prior to privatization.

Accordingly, Commerce's conclusion that there is no indication AST's labor force "changed substantially as a result of the privatization" appears warranted. Moreover, the court notes that Plaintiffs have failed to rebut the logical conclusions that spring from section 6.1.

**B**

**The Imposition of Countervailing Duties Based on the "Same Person" Test has no Clear Basis in Law and Appears to Bypass the Federal Circuit's Instructions in <u>Delverde III</u>**

Plaintiffs have vehemently attacked Commerce's new approach, claiming that it has no basis in the <u>Delverde III</u> decision or the statute and is a transparent attempt by Commerce to shirk its statutory responsibility. Indeed, Plaintiffs claim that "the Department's position has no statutory basis whatsoever. The Department posits a concept of 'distinct' person that means something totally different and inconsistent with the term 'person' as defined in the statute." AST's Supplemental Brief at 9. They further claim that the "Department's definition includes a vague and self-serving concept of successorship." <u>Id.</u> Plaintiffs aver that in the statutory context, "'person' simply means entity." <u>Id.</u> at 10 (footnotes omitted). In support of this reading of the term, Plaintiffs cite the Statement of Administrative Action ("SAA") accompanying the URAA, which defines "person" as "the commercial entity, such as a firm or industry, to which the government . . . provides a financial contribution." H. Doc. 103-316, Vol. VI, 103d Cong., 2d Sess. (1994).

19

Despite the "same person" test's ability to demonstrate certain features of the privatized entity remain untouched, its analysis effectively presupposes that some benefit of a subsidy travels with the assets of a company. Moreover, despite not expressly barring the "same person" test, the general holding of Delverde III appears to stand in opposition to the thrust of the test's focus. As discussed, the "same person" test will deem the pre-sale entity to be equivalent to the post-sale entity, if the latter was "operated in substantially the same manner before and after the change in ownership." Remand Determination at 13. Although Commerce's logic is not inherently unreasonable, that "nothing material has changed since the original bestowal of the subsidy," id. at 7, its assumption ignores the fundamental logic of Delverde III. In particular, the Federal Circuit appears to have been concerned about *any* per se assumption regarding the presence of a contribution and a benefit following a change in ownership, stating:

> "Although Commerce characterizes a change in ownership as an issue of 'subsequent events' or 'effects' that it can disregard, we disagree. A change of ownership is neither. First, the fact that Congress added the Change of Ownership provision to the statute refutes such assertions of irrelevance. **As we stated earlier, that provision prohibits a per se rule for determining whether a subsidy continues to be countervailable to a new owner following a change of ownership.** As such the statute clearly contemplates its possible relevance and contemplates that under some circumstances the purchaser will not be deemed to have received a subsidy."

Delverde III at 1367 (emphasis added). Moreover, the Federal Circuit's discussion of Commerce's failure to make specific findings of a contribution and benefit does not suggest there are instances where such findings may be foregone under the statute:

> "As such, Commerce has adopted a per se rule that a person receives a subsidy in these circumstances and has failed to make the specific findings of financial contribution and a benefit to Delverde that are required by §§ 1677(5)(D) and (E). That conclusion is in direct conflict with the statute."

Id.

20

Nonetheless, Commerce contends the "same person" approach is consistent both with Delverde III and the World Trade Organization's Appellate body's holding in UK Leaded Bar. Commerce asserts that, although the court in Delverde III did not expressly discuss personhood in the context that Commerce now asserts is critical, the court was "under the impression that Delverde was a different person from the original subsidy recipient," Remand Determination at 5, and moreover that "[t]he Delverde III court was under this impression because the parties' presentations seemed to characterize the Delverde change-in-ownership transaction as simply one firm selling some of its assets to another firm, which would indicate that the assets now belonged to a different 'person.'" Id. at fn.2.

Plaintiffs refer to Commerce's internal regulations regarding the interpretation of the Act, which state that a "person" is "any interested party as well as any other individual, enterprise, or entity, as appropriate." 19 C.F.R. § 351.102(b).  The regulation further clarifies that:

> The Act contains many technical terms applicable to antidumping and countervailing duty proceedings. In the case of terms that are not defined in this section or other sections of this part, readers should refer to the relevant provisions of the Act. This section:
>
> (1) Defines terms that appear in the Act but are not defined in the Act;
>
> (2) Defines terms that appear in this Part but do not appear in the Act; and
>
> (3) Elaborates on the meaning of certain terms that are defined in the Act.

Id. §351.102.  The term "person" is not defined within the Act and thus falls under section 1.  As such, this court is informed by the regulation's definition, which clearly supports the Plaintiffs' interpretation of the term as a generic and inclusive reference to various classes of business entities.  Therefore, Commerce's interpretation of "person" to mean a post-sale entity that is a distinct person from the pre-sale entity appears to be in conflict with the regulation.

The legislative history of the URAA, unfortunately, does little to clarify the situation other than to reiterate the Delverde III disposition regarding the impermissibility of an absolute per se rule. Regarding the new Change of Ownership provision, the House Report states:

> Section [1677(5)(F)] is being added to the Act to clarify that the sale of a firm at arm's-length does not automatically, and in all cases, extinguish any prior subsidies conferred. Absent this clarification, some might argue that all that would be required to eliminate any countervailing duty liability would be to sell subsidized productive assets to an unrelated party. Consequently, it is imperative that the implementing bill correct and prevent such an extreme interpretation.
>
> The issue of the privatization of a state-owned firm can be extremely complex and multifaceted. While it is the Committee's intent that Commerce retain the discretion to determine whether, and to what extent, the privatization of a government-owned firm eliminates any previously conferred countervailable subsidies, Commerce must exercise this discretion carefully through its consideration of the facts of each case and its determination of the appropriate methodology to be applied.

H.R. Rep. No. 103-826(I) at 110 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 3882.

Against this backdrop, Commerce is asking this court to embrace a strained and highly conjectural reading of Delverde III. Although the Delverde III court was confronted with a change in ownership involving the purchase and sale of assets as opposed to a transfer of stock, Commerce is speculating as to whether the court would dispense with the contribution and benefit analysis in the latter scenario. While Commerce claims that the court in Delverde III impliedly laid groundwork for treatment of stock transfer scenarios, separate and apart from the treatment that was expressly discussed in that case, it does not allude to any language, statutory or otherwise, to support this proposition.

Although the "same person" test is not all encompassing like Commerce's original per se rule, it still operates in a per se fashion for this subset of possible change in ownership scenarios. It is conceivable that a change in ownership might very well be virtually in name only (i.e., it satisfies the "same person" test), without the benefit associated with the contribution traveling to

the post-sale entity. However, Commerce's "same person" test, although not ensuring, as AST argues, "that subsidies automatically travel in full in every change of ownership", AST's Supplemental Brief at 14, can and will overlook those instances where a change in ownership satisfies the test, in the absence of a benefit to the post-sale entity. It is effectively another per se rule. Once again, where the post-sale entity is deemed the "same person" as the pre-sale entity, a benefit is per se ascribed to the former. Hence Commerce, as AST maintains, seeks to carve out an "exception" to the Delverde III holding. This fact is underscored by the all or nothing outcome of the test when compared to less severe outcomes.[5]

There is no indication that the Delverde III court considered the array of ramifications that accompany distinct personhood in the CVD context as Commerce maintains, let alone any indication that it advocated any separate analysis as a prelude to the benefit and contribution analysis that it did discuss in detail. Although the court did mention the term "person", it is not evident that it was doing anything more than simply reiterating the language of the statute without loading that term with greater import.[6] As Plaintiffs state, "the question of whether the purchaser was a different 'person' is clearly without significance in the Court's analysis or the statutory scheme on which it relied." AST's Supplemental Brief at 7.

The "same person" test, while demonstrating that a privatization transaction may, in fact, change little other than corporate ownership, fails to address certain mitigating factors that are as significant as the unaltered nature of the entity's assets, labor force, debt structure, and general

---

[5] For example, if Commerce were to compromise and dispense with the contribution analysis upon finding the post-sale entity is the "same person", but then still engage in the benefit analysis, the per se nature of the "same person" test would be mitigated. However this is not the case.

[6] The court merely said that "[t]he statute clearly states that Commerce must determine that a *person* received both a financial contribution and a benefit, either directly or indirectly, through one of the acts enumerated, and provides no presumption for any change of ownership situation . . . . Commerce's methodology is inconsistent with the plain language of the amended statute." Delverde III at 1368 (emphasis added).

business operations. In this case, it appears that AST was largely preserved, by design, to ensure its purchasers the enjoyment of its relative strengths following acquisition. This is the hallmark of many corporate acquisitions, where the total business entity is more attractive than its individual components. Hence it is to be expected that certain material aspects of these business entities will survive privatization. As an intuitive matter, it follows that the "passing through" of certain non-physical assets of the pre-privatized entity to the privatized entity is more likely in these scenarios. Included in this category is the benefit associated with a countervailable subsidy. Intuition, however, is not necessarily reality. In automatically attributing the full value of the pre-privatization subsidy to KAI-AST, the "same person" test substitutes intuitive reality for empirical proof.

**1**

**The "Same Person" Test Ignores Material Factors that May Negate or Mitigate the Benefit Conferred Upon the Privatized Entity**

As discussed above, Commerce's "same person" test, when satisfied, without any consideration of factors that may offset or completely negate a benefit associated with a given subsidy, attributes the full extent of such benefit to the privatized entity. That nonconsideration makes the test summary and unfair and thus its determination is unsupported by substantial evidence.[7]

---

[7] In situations such as the current one, Commerce has argued that it should be given the latitude to persuasively demonstrate that the post-sale entity must have benefitted from a contribution made to the pre-sale entity, without engaging in a full scale benefit and contribution analysis. See Allegheny Ludlum, Corp., et al. v. Unites States, 2001 Ct. Intl. Trade LEXIS 129 (CIT 2001). There are some parallels between Allegheny Ludlum and the current case. For instance, the court might embrace Commerce's "same person" test on the basis that it provides Commerce the flexibility to avoid costly and redundant benefit and contribution analyses by convincingly demonstrating that a post-sale entity is, by definition, a beneficiary of a contribution to the pre-sale entity. However, unlike Allegheny Ludlum, where Commerce declined to

In this case, it strikes the court that the "same person" test completely ignores the Plaintiffs' assertion that KAI paid full value for AST's assets. As AST complains, "[u]nder the Department's remand determination methodology, the amount paid for AST is totally irrelevant." AST's Supplemental Brief at 29. Indeed it is possible that, as Plaintiffs argue, the value of any benefit received by a subsidized predecessor would be accounted for in full by a company's buyers. At the very least, the benefit stemming from a nonrecurring subsidy may be mitigated by a purchase price that reflects the value of such benefit, especially if AST, as Plaintiffs assert, had "literally paid in full for everything they received." AST's Brief in Support of Motion for Judgment on the Agency Record Under USCIT 56.2 ("AST's Brief") at 14. Logic dictates that a subsidy and the attendant benefit, which by definition is a valuable contribution bestowed without adequate remuneration,[8] cannot exist where that benefit is purchased for full

---

undertake a new and separate countervailing duty investigation during an already ongoing CVD investigation, here Commerce is attempting to avoid completing an ongoing CVD investigation. This critical distinction bars the complete application of the Allegheny Ludlum rationale. Since Commerce is already engaged in a CVD investigation it cannot, in the name of efficiency considerations, dispense with its obligation to render a fair and accurate determination. Therefore, to the extent that its "same person" test forgoes accuracy in favor of expedience, it cannot stand. As a result, while the test efficiently and compellingly demonstrates that a contribution likely passed through to the privatized entity where it is the "same person" as the government owned entity, the test's failure to more fully probe the nature and character of the potential benefit enjoyed by the privatized entity cannot be sustained by the discussed efficiency rationale.

[8]  19 U.S.C. §1677(5)(E) provides:

> Benefit conferred. A benefit shall normally be treated as conferred where there is a benefit to the recipient, including—
>
> (i) in the case of an equity infusion, if the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made,
>
> (ii) in the case of a loan, if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable

consideration.  Indeed, the <u>Delverde III</u> court itself stated with regard to Commerce's previous

methodology:

> Had Commerce fully examined the facts, it might have found that Delverde paid full value for the assets and thus received no benefit from the prior owner's subsidies, or Commerce might have found that Delverde did not pay full value and thus did indirectly receive a "financial contribution" and a "benefit" from the government by purchasing its assets from a subsidized company "for less than adequate remuneration."

<u>Delverde III</u> at 1368 (citations omitted).

Although the court recognizes that the purchase of a public entity's assets at fair market

value is not dispositive of a benefit determination under the statute, that fact must be fairly

considered in arriving at that determination.  Indeed, Defendant-Intervenors are correct in

pointing out that:

> [T]he only facts AST deemed relevant to the agency's determination of whether a subsidy was eliminated by a change of ownership - whether the sale was made at fair market value and whether the price was arrived at through arm's length negotiations - are the very facts that the statute and the <u>Delverde</u> court held are <u>not</u> determinative of whether a subsidy has been eliminated."

---

commercial loan that the recipient could actually obtain on the market,

(iii) in the case of a loan guarantee, if there is a difference, after adjusting for any difference in guarantee fees, between the amount the recipient of the guarantee pays on the guaranteed loan and the amount the recipient would pay for a comparable commercial loan if there were no guarantee by the authority, and

(iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased, if such goods are purchased for more than adequate remuneration.

For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

Defendant-Intervenors' Brief In Opposition to Plaintiffs' Rule 56.2 Brief and AST's

Supplemental Briefs Addressing Commerce's Redetermination on Remand ("DI's Brief") at 11-

12 (emphasis in original). However, because a given factor is not dispositive does not make it

irrelevant.[9] As Plaintiffs contend, Commerce's test appears to miss the mark and "[r]ather the

fundamental issue is whether any such alleged 'successor' *actually received a market benefit*

*during the period of review* with regard to the products under investigation." AST's

Supplemental Brief at 18 (emphasis in original).[10]

---

[9] However, the Defendant-Intervenors' companion argument that the fact the current subsidies are non-recurring and were allocated prior to the current privatization does not itself invalidate the "same person" test's outcome is accurate. As the Defendant-Intervenors state, "Commerce and the courts have long-recognized that nonrecurring subsides, such as the massive grants and equity infusions received by AST, may be allocated and countervailed over a period of years." Id. at 14 (citing Saarstahl AG v. United States, 78 F.3d 1539, 1543 (Fed Cir. 1996); Countervailing Duties; Final Rule, 63 Fed. Reg. 65,348, 65,415-17 (1998) (§§ 351.524 and 525); S. Rep. No. 249, 96th Cong., 1st Sess., at 85-86 (1979)). Moreover as a logical corollary, "[w]here nonrecurring subsidies are provided to a company, the subsidy benefit is allocated over time based on the average useful life of the company's assets . . . . [T]he Department recognizes that the bestowal of a nonrecurring subsidy to a company will provide a financial contribution and a benefit to that company's exports for many years." Id. (citations omitted). Moreover, if this approach were rejected, then all non-recurring subsidies, whose impact and benefit are enjoyed subsequently in the form of enhanced productivity, cost-advantage, etc. would always escape the imposition of countervailing duties.
    Nonetheless, since the "same person" test focuses almost exclusively on the dynamics of successorship as a proxy for a more focused benefit investigation, the imposition of countervailing duties based thereon is not supported by substantial evidence.

[10] The "same person" test and its faults in relation to Delverde III are comprehensively analyzed in two recent decisions Allegheny Ludlum Corp. et al. v. United States, 26 CIT __, 2002 Ct. Intl. Trade Lexis 1, Slip-Op. 02-01 (January 4, 2002) and GTS Industries S.A. v. United States, 26 CIT __, 2002 Ct. Intl. Trade Lexis 2, Slip-Op. 02-02 (January 4, 2002). The court notes that the same person test was rejected in the above decisions under a similar rationale.

> Although Commerce's "person" analysis is not an explicit *per se* rule, it still fails to meet the requirements of the statute because it concludes that a purchaser received a subsidy without making "specific findings of financial contribution and benefit . . . that are required by §§1677(5)(D) and (E)." *Delverde III*, 202 F.3d at 1367. An initial public offering of a formerly government controlled corporation will often involve the same entity pre- and post-sale using Commerce's criteria. Indeed, in nearly every circumstance that a state-run enterprise is privatized as a whole entity, Commerce would be able to find that the same "person" exists.

C

**Since the "Same Person" Test Does Not Pass Muster Under <u>Delverde III</u>, Commerce's Obligations under International Law and the Charming Betsy Doctrine Are Not Relevant**

Since Commerce's "same person" test determines the presence and scope of a potential benefit in <u>per se</u> fashion, it fails under the rationale articulated in <u>Delverde III</u> and as such, the court need not deal with Commerce's obligations under international law and the *Charming Betsy* doctrine. It is sufficient to recognize that under the WTO's decisions in <u>UK Leaded Bars</u>, Commerce's focus on principles of successorship as the sole criteria for the imposition of countervailing duties in the absence of a benefit determination was also rejected.

 In <u>UK Leaded Bars</u>, with regard to Commerce's argument that the subject government owned and subsequently privatized company were the "same person", the WTO Panel and Appellate Body responded:

> We, however, are in no doubt that, for the purpose of determining "benefit", a clear distinction should be drawn between BSC, and UES and BSplc/BSES respectively. This is because the changes in ownership leading to the creation of UES and BSplc/BSES involved the payment of consideration for the productive assets etc. acquired by those entities from BSC. Since the finding of "benefit" to BSC was effectively based on BSC acquiring those productive assets etc. for free, the fact that consideration is provided for those productive assets etc. by UES and BSplc/BSES, or the owners thereof, must raise the possibility that the original "benefit" determination in respect of BSC is no longer valid for UES and BSplc/BSES respectively. For this reason, we consider that the changes in ownership leading to the creation of UES and BSplc/BSES should have caused the USDOC to examine whether the production of leaded bars by UES and BSplc/BSES respectively, and not BSC, was subsidized. In particular, [Commerce] should have examined the continued existence of "benefit" already deemed to have been conferred by the pre-1985/86 "financial contribution" to BSC, and it should have done so from the perspective of UES and BSplc/BSES respectively, and not BSC.

---

Commerce's use of a methodology that eliminated the need to determine if the subsidies passed through to the privatized entity in this situation was specifically rejected by the Federal Circuit in *Delverde III*.

<u>Allegheny Ludlum Corp.</u>, 26 CIT __, Slip-Op. 02-01 at 18.

28

> The United States has argued that there is no need to determine "benefit" in respect of successor companies . . . . We consider that the presumption of "benefit" flowing from united, non-recurring "financial contributions" is rebutted in the circumstances surrounding the changes in ownership leading to the creation of UES and BSplc/BSES respectively. In such circumstances, the continued existence of benefit to UES and BSplc/BSES respectively must be demonstrated.

UK Leaded Bars Panel Report at para 6.70-71 (footnotes omitted). Although the WTO Panel reaches a conclusion similar to the one herein, the court merely takes note of the holding's thrust without opining on Commerce's obligations thereunder.

## D
## Commerce Properly Relied Upon Adverse Facts Available

Commerce's resort to other facts available and adverse facts available in devising its new privatization methodology was the result of AST's and the GOI's willful non-compliance with Commerce's questionnaires and, as such, Commerce proceeded appropriately. Plaintiffs complain that as a result, the extent of the current subsidies were unfairly overstated. AST's Supplemental Brief at 30. However, Commerce, in arriving at its new privatization methodology, provided the respondents with an array of questions seeking pertinent information. Indeed, an explanation as to the questions' significance was provided to the respondents. The respondents thought such questions irrelevant to Commerce's investigation and refused to provide answers. As such, they cannot be heard to complain about Commerce's decision to employ adverse facts available to fill this void.

In particular, Commerce averred that "with regard to the pre-privatization asset spin-offs as well as the post-privatization sales of shares . . . [a]lthough there is some information regarding these transactions on the record from the investigation, we find that this information does not provide an adequate basis on which to determine whether these sales represented new

29

entities that were sold from ILVA (the pre-1993 asset spin-offs) or AST (the post-privatization sales of shares). Consequently we determine that the information on the record is too incomplete to serve as a reliable basis for the determination with respect to these transactions." Remand Determination at 23-24. As a result, Commerce forwarded questionnaires aimed at acquiring this information to the respondents.

In fact, Commerce provided the respondents two independent opportunities to respond to these questionnaires, both of which were declined. See Remand Determination at 23-25. Moreover, the respondents' decision not to comply was not motivated by any inadvertent roadblock, such as a clerical error. Rather, AST explained its failure to respond on the basis that "these transactions are not relevant to the terms of AST's privatization, the Department's treatment of which is the subject of this remand . . . If the Department believes it needs additional information regarding any of these transactions, AST, the GOI and the EC respectfully request that the Department explain how such information is pertinent to the proper scope of this remand." AST Remand Questionnaire Response at 28-29. That situation does not come close to situations where a respondent acted to the best of its ability under the circumstances. See e.g., Acciai Speciali Terni v. United States, Slip-Op 01-36, 38-41 (March 31, 2001). Nonetheless, Commerce complied with the above request and stated:

> [t]he purpose of this remand is to re-examine our change-in-ownership methodology, in light of, inter alia, Delverde. We therefore reiterate our request for complete remand questionnaire responses with regard to all of the changes in ownership. If we determine that this information is necessary to our remand determination and it is not provided, we may resort to facts otherwise available, including assumptions that are adverse to the respondents' interests.

Remand Determination at 24 (quoting Commerce's Remand Supplemental Questionnaire at Question 15).

This statement is direct and its thrust patently obvious; the dynamics of the subject change-in-ownership is most certainly relevant in compiling a definitive change-in-ownership

30

methodology, especially given the court's directions in <u>Delverde III</u>. Therefore, the respondents'

second refusal to answer these questions strikes the court as providing a reasonable basis for

Commerce to conclude that cooperation was lacking. Furthermore, as Defendant-Intervenors

state, "[I]n making this choice, the parties were well aware of the possible consequence of their

non-compliance, as the Department explicitly advised them at each stage of the remand that

failure to provide requested information could result in a finding using adverse facts available, or

adverse facts available." DI's Brief at 40 (citing <u>Remand Determination</u> at 18).

Commerce correctly proceeded under the statutes governing the use of adverse facts

available, 19 U.S.C. § 1677e[11] and 19 U.S.C. § 1677m.[12] As "the necessary information [was]

---

[11] § 1677e. Determinations on the basis of the facts available

(a) In general. If--
 (1) necessary information is not available on the record, or
 (2) an interested party or any other person--
 (A) withholds information that has been requested by the administering authority or the Commission under this title,
 (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 782 [19 USCS § 1677m(c)(1) and (e)],
 (C) significantly impedes a proceeding under this title, or
 (D) provides such information but the information cannot be verified as provided in section 782(i) [19 USCS § 1677m(i)], the administering authority and the Commission shall, subject to section 782(d) [19 USCS § 1677m(d)], use the facts otherwise available in reaching the applicable determination under this title.

[12] § 1677m provides, in relevant part:

Conduct of investigations and administrative reviews.

c) Difficulties in meeting requirements.
 (1) Notification by interested party. If an interested party, promptly after receiving a request from the administering authority or the Commission for information, notifies the administering authority or the Commission (as the case may be) that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information, the administering authority or the Commission (as the case may be) shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party.

not available on the record," § 1677e was triggered.  Secondly, the Department conducted itself

according to § 1677m, by first finding that the original set of responses were deficient and then

offering an opportunity to correct the deficiency.  Also, consistent with § 1677m(d), Commerce

informed the respondents of the nature of the deficiency.  In response to the respondents'

rationale for withholding the requested information, Commerce correctly concluded that the

parties had not "acted to the best of their ability to comply with [the Department's] requests for

information," Remand Determination at 25 and 36-37, thereby warranting the use of adverse

facts available under § 1677e.

---

(2) Assistance to interested parties. The administering authority and the Commission shall take into account any difficulties experienced by interested parties, particularly small companies, in supplying information requested by the administering authority or the Commission in connection with investigations and reviews under this title, and shall provide to such interested parties any assistance that is practicable in supplying such information.

(d) Deficient submissions. If the administering authority or the Commission determines that a response to a request for information under this title does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this title. If that person submits further information in response to such deficiency and either--
   (1) the administering authority or the Commission (as the case may be) finds that such response is not satisfactory, or
   (2) such response is not submitted within the applicable time limits, then the administering authority or the Commission (as the case may be) may, subject to subsection (e), disregard all or part of the original and subsequent responses.

(e) Use of certain information. In reaching a determination under section 703, 705, 733, 735, 751, or 753 [19 USCS § 1671b, 1671d, 1673b, 1673d, 1675, or 1675b] the administering authority and the Commission shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority or the Commission, if--
   (1) the information is submitted by the deadline established for its submission,
   (2) the information can be verified,
   (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
   (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and
(5) the information can be used without undue difficulties.

32

# VI
## CONCLUSION

Commerce has failed to devise a new privatization methodology that effectuates the underlying statute or the instructions of the Federal Circuit. Therefore, since the majority of the findings in the Remand Determination are invariably linked to the outcome of "same person" test, they cannot be sustained. On the basis of this test alone, Commerce has not articulated "a 'rational connection between the facts found and the choice made.' " Bando Chem. Indus. v. United States, 16 CIT 133, 136, 787 F. Supp. 224, 227 (1992) (quoting Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285 (1974)). In particular, Commerce assessed a subsidy rate of 17.25%, an upward assessment from 15.16%, which was almost entirely founded on the determination that the KAI-AST is the "same person" as GOI-AST. See AST's Supplemental Brief at 28. As discussed, although the determination that the two entities are the "same person" is supported by substantial evidence, Commerce's further conclusion that a benefit was enjoyed by KAI-AST as a result of a subsidy bestowed upon GOI-AST is not.

Commerce, in order to properly effectuate the statute, must demonstrate that such a benefit exists and it must prove its extent. Commerce's current assertion that simply because that GOI-AST and KAI-AST are the "same person" the full extent of the subject subsidy's benefit was enjoyed by the latter is unsupported. Therefore Plaintiffs' arguments that Commerce has overstated the current subsidy rate based on Commerce's revised privatization methodology is persuasive only to the extent that Commerce has not demonstrated a benefit at all. The court therefore refrains from further examination or breakdown of the assessed subsidy rate, as it is conceivable that Commerce may upon further remand demonstrate that this rate is justified. However, Commerce must examine and consider certain material facts as part of its analysis, including but not limited to the impact that the purchase price paid by KAI for AST's assets has

upon whatever benefit KAI-AST may have enjoyed.

For the foregoing reasons, the court finds that Commerce's <u>Remand Determination</u> is not supported by substantial evidence and is not in accordance with the law.

_____
Evan J. Wallach, Judge


Dated:     February 1, 2002
              New York, New York